IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CASEY LYNN BURNER,

        Plaintiff,

v.                                   Civil Action No. 2:13-CV-28

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

# REPORT AND RECOMMENDATION

## I. INTRODUCTION

### A. Background

On April 23, 2013, Casey Lynn Burner filed this action under 42 U.S.C. §1383(c) for judicial review of an adverse decision of the Commissioner of Social Security denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§1381-1383f.[1] The Commissioner filed her Answer on August 1, 2013.[2] Ms. Burner then filed her Motion for Summary Judgment on August 30, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on November 26, 2013.[4] Ms. Burner filed a Response in Opposition on December 18, 2013.[5] The motions are now ripe for this Court's review, and for this report and recommendation.

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 12.

[4] Docket No. 18.

[5] Docket No. 20.

**B. The Pleadings**

    1. Ms. Burner's Motion for Summary Judgment and Memorandum in Support.

    2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

**C. Recommendation**

    I recommend that:

1.     Ms. Burner's Motion for Summary Judgment be **DENIED** because (1) substantial evidence supports the ALJ's finding that Ms. Burner's impairments do not functionally equal the listings; (2) the ALJ properly considered the opinion of Dr. Holbert; and (3) newly submitted evidence to the Appeals Council does not create a conflict with the existing evidence such that remand is required.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

**A. Procedural History**

On March 30, 2010, Ms. Burner's mother, Lisa Burner,[6] applied on behalf of Ms. Burner for childhood SSI benefits alleging an onset of disability of July 24, 2004 due to juvenile diabetes. (R. 95.) The application for benefits was initially denied on May 21, 2010, and upon reconsideration on September 23, 2010. (R. 64-67, 71-73.) Ms. Burner requested a hearing before an ALJ, which was held on November 29, 2011. (R. 82-84, 37-61.) Ms. Burner, who was represented by counsel, testified at the hearing, as did Mrs. Burner. (R. 37-61.) On January 13, 2012, the ALJ issued an unfavorable decision to Ms. Burner finding that she was not disabled. (R. 32.) On January 21, 2012,

---

[6]For ease of understanding, the undersigned will refer to Lisa Burner as Mrs. Burner and Casey Burner as Ms. Burner.

Ms. Burner appealed this decision to the Appeals Council, which denied review of the ALJ's decision on March 8, 2013. (R. 1-5, 13.) Ms. Burner then timely brought her claim to this Court.

**B. Personal History**

Ms. Burner was born on February 19, 1995, making her 15 years old on the date of her disability determination. (R. 95.) At the time of the November 29, 2011, hearing before the ALJ, Ms. Burner was a junior in high school, and she lived at home with her mother and one younger brother. (R. 48-49.)

**C. Medical History**

*1. West Virginia University Pediatric Endocrine Clinic*

Ms. Burner was diagnosed with Type 1 Diabetes Mellitus ("DM") on July 24, 2004, when she was nine years old. (R. 248.) Shortly thereafter, she began periodic diabetes examinations with Evan A. Jones, M.D., at the West Virginia University Pediatric Endocrine Clinic. On August 25, 2004, Dr. Jones saw Ms. Burner for the first time. (R. 248.) Dr. Jones noted that Ms. Burner received insulin injections and was carbohydrate counting. (*Id.*) She received "13 units NPH 9 units Novolog at breakfast and 5 units NPH 2 units Novolog at dinner" with sliding coverage of "one unit for every 50 mg/dl elevation over 150." (*Id.*) A review of blood sugars showed "mild elevation at bed time," but, "the blood sugars at other times of the day are very well controlled." (*Id.*) Dr. Jones concluded that he was "pleased with the current control. No changes were needed in the insulin dose. Blood sugars will continue to be forwarded for my review between now and her return to clinic in approximately four months." (*Id.*)

Ms. Burner next saw Dr. Jones on January 12, 2005. (R. 246.) Her insulin injections were "17 units NPH 10 units Novolog at breakfast and 5 units NPH 5 units Novolog at dinner" with

sliding coverage of "one unit for every 40 mg/dl elevation over 160." (*Id.*) A review of blood sugars showed "a tendency to be low before lunch on weekends" and "occasionally still mildly elevated at dinner." (*Id.*) Dr. Jones noted that "the sliding coverage is often not adequate to bring down a higher sugar value. She has been more fatigued recently." (*Id.*) Lab work showed that Ms. Burner's A1c result was 6.0%. (*Id.*) Dr. Jones requested that the morning Novolog dose be decreased to 8 units and discussed insulin pump therapy with the family. (*Id.*)

On May 23, 2005, Dr. Jones noted that Ms. Burner had started insulin pump therapy and that "she and the family are very pleased with the control on pump therapy." (R. 244.) The pump settings were "12 a.m. 0.55, 3 a.m. 0.75 and 9 a.m. 0.7 units/hour" with "1 unit for every 14 grams of carbohydrates." (*Id.*) The sensitivity setting was "1 unit for every 40 mg/dl elevation over the target range of 90-150." (*Id.*) A review of blood sugars demonstrated "a tendency to be mildly elevated at lunch. The sliding coverage is adequate to correct higher blood sugar values." (*Id.*) Dr. Jones requested that the 9 a.m. rate be increased and a 12 p.m. rate be added.

On November 28, 2005, Dr. Jones noted pump settings of "12 a.m. 0.75, 3 a.m. 0.95, 9 a.m. 1.1 and 12 p.m. 1.15  units/hour" with "1 unit for every 14 grams of carbohydrates." (R. 242.) A review of blood sugars showed "a tendency to be high throughout the day and following meals. The sliding coverage is not adequate to correct higher blood sugar values." (*Id.*) Dr. Jones requested across the board rate increases of the insulin pump. (*Id.*) On July 7, 2006, Dr. Jones again noted increased pump settings, and a review of blood sugars showed "a tendency to be high at breakfast and lunch." He also requested an increase in rates. (R. 240.) The next treatment note from Dr. Jones is on June 4, 2007, where he noted Ms. Burner's A1c was 9.3% on May 25, 2007. Dr. Jones also noted that he had not received any blood sugar values from the family since the July of 2006 clinic

visit. (R. 239.)

On February 28, 2008, Dr. Jones saw Ms. Burner in the clinic. A review of blood sugars showed "a tendency to be high in the morning and often other times as well. She is generally checking 1-2 times per day. The sliding coverage is not adequate to correct higher blood sugar values." (R. 237.) Ms. Burner's A1c was 9.9%, which Dr. Jones noted "is moderately elevated and is consistent with an average blood sugar value of 240 mg/dl. Dr. Jones requested that the insulin rates be increased. (*Id.*) He also noted that he had not received any blood sugar values from the family since July of 2006. (*Id.*) On July 3, 2008, Dr. Jones noted that Ms. Burner's blood sugars continued to "be high at breakfast, rising after meals and highest at dinner overall. The sliding coverage is not quite adequate to correct higher blood sugar values." (R. 235.) Dr. Jones again noted that he had not received any blood sugar values since March of 2008. (*Id.*) Dr. Jones requested that the insulin coverage be increased and that blood sugar values be routinely written down. (*Id.*)

Ms. Burner's next visit with Dr. Jones was on April 6, 2009. (R. 232-34.) Ms. Burner reported that she was "quite tired recently." (R. 232.) Dr. Jones noted that "she has not been monitoring blood sugar values very well, and there have been a lot of difficulties in interaction between her mother and daughter in terms of trying to get her to do better with monitoring. Her mother reports that she does have her involved with counseling at school to assist with this issue." (*Id.*) A physical examination showed a blood pressure of 123/81 and a pulse of 111 beats per minute, but was otherwise normal. (R. 233.) Ms. Burner's A1c was 11.7%. Dr. Jones noted that thyroid studies were normal and concluded that the fatigue was not due to thyroid problems. (*Id.*) Dr. Jones noted that the A1c result was "quite high" and "puts her at very high risk of early diabetic complications." He requested that her insulin coverage be increased and stated that "blood sugar

values need to be monitored much more frequently than she has been doing, recorded and reacted upon by either her or by me." (R. 233.)

On July 8, 2010, Dr. Jones performed a physical examination of Ms. Burner. He noted that she had no known complications and had been healthy. (R. 229.) He reported not receiving any blood sugar values since the last visit to the clinic over a year ago. A review of blood sugar revealed that values were "not dropping adequately with current sliding coverage and generally high." (*Id.*) A physical examination was generally normal. (R. 230.) Dr. Jones adjusted the maximum bolus to 25 units and requested that more blood sugar values be forwarded for his review. (R. 231.) On November 15, 2010, Dr. Jones again reported not receiving any blood sugar values. (R. 226.) A review of blood sugars showed that Ms. Burner was "basically only checking 1 value per day; reports a few lows 2 AM." (*Id.*) A review of systems and physical examination were normal. (R. 226-27.)

Ms. Burner's last reported visit with Dr. Jones was on March 8, 2011. Dr. Jones noted the most recent A1c result was 8.6%. (R. 225.) He again reported that he had not received any blood sugar values from the family and that Ms. Burner "has not been checking a lot of blood sugar values." (*Id.*) A review of blood sugar values showed "some values checked at school. There were few boluses for meals and were usually 25 unit boluses." (*Id.*)

*2. The Myers Clinic*

Ms. Burner's primary health care provider is Dr. Cecil Holbert at the Myers Clinic. On May 13, 2009, Dr. Holbert noted that Ms. Burner was "testing up to hourly" and had "not been to Jones lately." (R. 192.) Ms. Burner's A1c on that date was 9.57% and her blood sugar was 242 mg/dl. (R. 195, 197.) On October 14, 2009, Dr. Holbert reported that Ms. Burner's glucose level was increased,

and he increased her insulin coverage. (R. 191.)

On May 7, 2010, Ms. Burner was seen by Dr. Holbert for a "flying" heartbeat. (R. 210.) She reported that the symptoms occurred infrequently. (*Id*.) Dr. Holbert noted that her A1c was very elevated and encouraged closer blood sugar monitoring. (*Id*.) He diagnosed her with palpitations and anxiety. (*Id*.) On June 28, 2010, Ms. Burner reported stomach problems. (R. 208.) Dr. Holbert noted that her sugars were doing much better. (*Id*.) Ms. Burner saw Dr. Holbert on August 3, 2010 for a check-up and blood work. (R. 207, 211-213.) Dr. Holbert noted that her "sugars much better controlled with current settings." (R. 207.) Her glucose was 183 and her A1c was 8.8%. (R. 211.)

On October 6, 2010, Ms. Burner reported severe left hip pain. (R. 278.) Dr. Holbert noted that x-rays and labs were all negative. (*Id*.) On the same day, Dr. Holbert noted that Ms. Burner was starting counseling for anxiety and prescribed her with Effexor. (R. 277.) On December 2, 2010, Ms. Burner saw Dr. Holbert for lab work. (R. 272-73, 276, 290-92.) She had no complaints. (R. 276.) Lab work revealed her glucose was 299 and her A1c was 8.6%. (R. 290, 292.) On January 21, 2011, Ms. Burner was seen by Dr. Holbert for sores on both legs and her groin that "get worse when her sugars are high and resolve when sugars come down." (R. 269-71.) Dr. Holbert diagnosed her with boils and prescribed Tetracycline. (R. 271.)

Dr. Holbert conducted a well-child examination on March 2, 2011. (R. 263-67, 285-89.) A physical examination was normal. (*Id*.) Lab work showed a glucose level of 390 and A1c of 9.2%. Additionally, Ms. Burner was diagnosed with hyperlipidemia and prescribed Lovastatin. Dr. Holbert assessed Ms. Burner as a "16 year well child." (R. 265.) Ms. Burner's last reported visit with Dr. Holbert was on July 7, 2011. (R. 260.) Her glucose was 139 and her A1c was 10.9%. (R. 260, 284.)

*3. Broaddus Hospital*

On December 2, 2009, Ms. Burner was seen at the emergency department of Broaddus Hospital for an injured left ankle due to playing basketball. (R. 184-88.) She was diagnosed with an ankle sprain. (R. 188.)

*4. United Summit Center*

On December 8, 2010, Ms. Burner underwent an initial mental health assessment at United Summit Center. (R. 250-58.) She presented with "problems of severe depression, moderate withdraw, sleeping problems." (R. 250.) Ms. Burner's mother reported that "she no longer goes out with friends, is not involved in sports anymore." (*Id.*) Ms. Burner reported "that she feels left out. Peers have been making fun of her due to her diabetic pump she has to wear. She also cut her wrist last week." (*Id.*) A mental status examination showed that Ms. Burner was oriented to person, place, time, and situation. (R. 251.) She was very quiet and her mother did most of the talking. (*Id.*) Her affect was flat and she denied any suicidal or homicidal thoughts. (*Id.*)

*5. Opinion Evidence*

On May 20, 2010, Cindy Osborne, DO, completed a Childhood Disability Evaluation Form. (R. 200-05.) Dr. Osborne found that Ms. Burner had no limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others, and health and physical well-being. (R. 202-03.) She found that Ms. Burner had less than marked limitations in the domains of moving about and manipulating objects and caring for yourself. (R. 203.) Based on these findings, Dr. Osborne concluded that Ms. Burner had severe impairments, but that they do not meet, medically equal, or functionally equal the listings. On August 19, 2010, Thomas Lauderman, DO, reviewed Dr. Osborne's assessment and affirmed it as written. (R. 217-23.)

Dr. Holbert submitted a letter dated December 12, 2011, wherein he stated that "it is my medical opinion that Casey requires twenty four hour supervision due to her unstable medical condition for a number of reasons." (R. 302.) He noted that her condition was "brittle" or "fragile" and requires the use of an insulin pump, which requires adult supervision to use and administer. Additionally, he noted that Ms. Burner had recently become "despondent and showing very poor judgment in dealing with her medical problems." Thus, she "cannot be relied upon to manage her insulin pump and medications solely on her own." He also noted that when Ms. Burner experiences episodes of hypoglycemia, she requires the use of a glucagon emergency kit, which also requires adult supervision to administer.

Lori Thompson MA, LPC, submitted a letter dated March 14, 2012, to the Appeals Council. (R. 304-06.) Ms. Thompson stated that she began mental health counseling with Ms. Burner in September of 2011, and since that time she had seen Ms. Burner approximately ten times. (R. 305.) She noted that Ms. Burner's "mental illness is interrelated with her diabetic condition" and that her "life has been significantly altered by her physical condition." (*Id*.) Ms. Thompson stated that Ms. Burner's "overall situation has resulted in a diagnosis of Major Depressive Disorder." (*Id*.) Ms. Thompson opined that Ms. Burner "cannot be trusted to adequately manage her medical condition without 24 hour adult supervision" because of her "lack of insight and poor judgment." (R. 306.) Ms. Thompson also stated that she reviewed Dr. Holbert's letter and that she is "in 100% agreement with everything contained in the letter." (*Id*.)

## D. Testimonial Evidence

Testimony was taken at the hearing held on November 29, 2011. The following portions of the testimony are relevant to the disposition of the case:

Ms. Burner testified that she did not have any difficulties wearing her insulin pump. (R. 46.) She stated that she last played basketball during her freshman year, in 2009, and that she played the whole season. (*Id*.) Ms. Burner also testified that she played in most of the team's games. (R. 47.) When asked about her difficulties in monitoring her blood sugar, Ms. Burner stated "I didn't really check my sugar a lot I guess because I didn't feel like it." (*Id*.) Ms. Burner testified that she participated in gym class during her freshman year, but that she does not currently participate in gym class "because it's only required our freshman year." (R. 48.) When asked what kind of physical activity she does, Ms. Burner stated, "Not really anything." (*Id*.) When asked why she does not do physical activity, Ms. Burner answered, "I'm not real sure." (R. 49.) Ms. Burner stated that she last went on vacation over the summer when she went to Virginia Beach with her father. (R. 49.) She testified that she was there for a week and that she "walked on the beach and went swimming." (*Id*.)

Regarding her mental health, Ms. Burner testified that she agreed with medical records indicating that she has no interpersonal relationship problems, no problems with parents or guardians, and no problems with siblings. (R. 50.) However, she stated that she does not have very high self esteem. (*Id*.) Ms. Burner stated that she plans to become a registered nurse after high school and that she plans to go to college. (*Id*.) She also testified that she gets along well with others in school. (*Id*.) When asked what she does in her free time, Ms. Burner answered that she helps her mother out in the house and watches her three-year-old nephew. (R. 50-51.) She testified that she watches her nephew every other week, usually for a couple of hours at a time. (R. 51.) She stated that when she watches her nephew, they "paint, watch cartoons, and go outside." (*Id*.) She also testified that she has watched him by herself, most recently a couple of months before. (*Id*.)

Next, Ms. Burner's attorney examined Mrs. Burner regarding whether Ms. Burner was every left alone with her nephew as follows:

> Q. Does Casey watch her nephew by herself?
>
> A. That's the first I've heard of it because the only time that she's watched him would be while I'm at work and I only work on Friday, Saturday and Sunday because I'm in school the rest of the time.
>
> Q. Is Casey, to your knowledge by herself ever?
>
> A. No.
>
> Q. Tell me about that? Who's with her?
>
> A. It's either her youngest brother. He's 14 years old because my oldest son, her oldest brother is 22 and he works out of town so he's only home every other week and the only time that she would have been alone with [her nephew] would have been if he went to town to the store.
>
> Q. When you're not with her who's with her?
>
> A. Her youngest brother.

(R. 52-53.) The attorney then asked Mrs. Burner about Ms. Burner's needs at school:

> Q. Have you had to make special arrangements at school for her given her medical condition?
>
> A. Yes.
>
> Q. What kind of arrangements have you had to make?
>
> A. Dr. Jones has had to give doctor's orders on her care whenever she's become hypoglycemic or hyperglycemic and we have to have those every year before the school year starts and then once the school year starts I have to make arrangements with the teachers. I have to go at 7:00, between 7:00 and 7:30 before the students come for an IEP meeting and we have to run through all the instructions that Dr. Jones has given and we have to pack a fanny pack that has her reservoirs, her infusion sets,  her glucagon kit, everything she would need. I even have to pack an extra glucometer for her,

everything that she needs to take care of her diabetes there and I even have to pack because she's allergic to bees also, an epipen and all of her doctor's orders and everything for that is in this fanny pack and we have to go over that with all of the teachers and everything that will be there.

Q. Has the school bus driver had to be involved in these specialized plans for Casey?

A. Yes.

Q. Now, as far as her insulin pump is she able to manage that completely by herself?

A. She, at school she has to. Whenever she checks her sugar she has to administer her bolus...she has to bolus her insulin pump in front of somebody.

Q. What about when she's not at school?

A. Whenever she's at home she usually does it in front of me or somebody else. We have to make sure that she does do it.

Q. Let me ask you again, with everything that's involved in using that pump, medications, the different ports, can she do that by herself?

A. I say no. The reason I'm saying that is because your sights have to be well, I'll say rotated and upside down W or an M and she does not rotate her sights. When her sugar becomes, when she becomes hypoglycemic she cannot check her sugar. There have been many instances that I have had to check her sugar whenever she becomes hypoglycemic.

(R. 53-55.)

## III. ALJ FINDINGS

An individual under the age of 18 is disabled under the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

In determining whether a child is disabled, the ALJ must follow the three-step process outlined in 20 C.F.R. §416.924. At step one, the ALJ must determine if the child is engaging in substantial gainful activity. 20 C.F.R. §416.924(a). If so, the child is not disabled. *Id.* If the child is not engaging in substantial gainful activity, the analysis proceeds to the second step, and the ALJ must determine whether the child has a medically determinable impairment that is severe. 20 C.F.R. §416.924(c). If the ALJ determines that the child has a severe, medically determinable impairment, the third and final inquiry is whether the impairment "meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." 20 C.F.R. §416.924(d). At the third step of the childhood disability determination, if the ALJ determines that the child's impairments or combination of impairments do not meet or medically equal any listing, the ALJ must next decide if the impairment results in limitations that functionally equal the listings. An impairment functionally equals a listed impairment if the child exhibits "marked" limitations in two of six domains, or an "extreme" limitation in one domain. 20 C.F.R. 416.926a(a). These six domains are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. 416.926a(b)(1). A "marked" limitation "interferes seriously with the ability to independently initiate, sustain, or complete activities." It also means a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. 416.926a(e)(2). An extreme limitation "interferes very seriously with your ability to independently initiate, sustain, or complete activities." It also means a limitation that is "more than marked." 20 C.F.R. 416.926a(e)(3). If the child's impairments meets, medically equals, or functionally equals the listings, and meets the duration

requirements, the child is disabled. 20 C.F.R. §416.924(d)(1). If not, the child is not disabled. 20 C.F.R. §416.924(d)(2).

Here, the ALJ followed the three-step procedure in determining that Ms. Burner was not disabled. The ALJ first determined that Ms. Burner has not engaged in substantial gainful activity. Next, the ALJ found that Ms. Burner suffers from two severe impairments; diabetes mellitus ("DM") and depression. However, the ALJ also found that these impairments do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this determination, the ALJ specifically considered "109.00 (Endocrine Disorders) and 112.00 (Mental Disorders)." Next, the ALJ considered the six domains of functioning and found that Ms. Burner's impairments have caused (1) no limitation in acquiring and using information; (2) no limitation in attending and completing tasks; (3) less than marked limitations in interacting and relating to others; (4) less than marked limitations in moving about and manipulating objects; (5) less than marked limitations in the ability to care for herself; and (6) less than marked limitations in health and physical well-being. The ALJ concluded that Ms. Burner does not have an impairment or combination of impairments that functionally equals the severity of the listings.

## IV.  THE MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

Ms. Burner contends that the ALJ's decision is not supported by substantial evidence. Specifically, she argues that the ALJ erred by not finding that her condition functionally equals listing 109.00(C). Additionally, Ms. Burner asserts that the ALJ erred as a matter of law by failing to give proper weight to her treating physician's opinions. Commissioner argues that substantial

evidence supports the ALJ's determination that Ms. Burner is not disabled and that the ALJ properly weighed the medical opinions.

**B. The Standards**

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*2. Judicial Review*

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the

Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

**D. Discussion**

At issue is the ALJ's finding that Ms. Burner's impairments do not functionally equal listing 109.00, which provides, in relevant part:

> Listing 109.08 is only for children with DM who have not attained age 6 and who require daily insulin. For all other children (that is, children with DM who are age 6 or older and require daily insulin, and children of any age with DM who do not require daily insulin), we follow our rules for determining whether the DM is severe, alone or in combination with another impairment, whether it meets or medically equals the criteria of a listing in another body system, or functionally equals the listings under the criteria in § 416.926a, considering the factors in § 416.924a. The management of DM in children can be complex and variable from day to day, and all children with DM require some level of adult supervision. *For example, if a child age 6 or older has a medical need for 24–hour-a-day adult supervision of insulin treatment, food intake, and physical activity to ensure survival, we will find that the child's impairment functionally equals the listings based on the example in § 416.926a(m)(5).*

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 109.00(C) (emphasis added).

Ms. Burner asserts that the ALJ erred in determining that her condition does not functionally equal listing 109.00(C) because the evidence shows that she requires 24-hour-a-day adult supervision for the treatment of her diabetes. She alleges that (1) the ALJ improperly disregarded the evidence in the record and relied on irrelevant information in determining that her impairments do not functionally equal the listings; (2) the ALJ improperly rejected the opinion of Ms. Burner's treating physician, Dr. Holbert; and (3) the Appeals Council failed to discuss its evaluation of newly

submitted evidence making meaningful review by this Court impossible. The Court will discuss each contention in turn.

*1. Whether Substantial Evidence Supports the ALJ's Finding that Ms. Burner's Impairments Do Not Functionally Equal the Listings?*

Ms. Burner contends that the sole issue in this case is whether she has a medical condition requiring 24-hour-a day adult supervision. She argues that because she is required to wear an insulin pump and carry a glucagon emergency kit, which are both devices that a child cannot properly operate, it is a medical fact that she needs 24-hour-a-day adult supervision. Ms. Burner states, "it is a medical fact that a child...is not capable of operating the type of medical device her condition requires without assistance from an appropriate adult." Therefore, she contends that the issue "is purely a medical question" and the ALJ relied on irrelevant information in concluding that she did not require 24-hour-a-day supervision.

The undersigned finds that Ms. Burner's argument lacks merit. The question of functional equivalence is a subjective one requiring the ALJ to assess how the impairment "affects the child's ability to function compared to children of the same age who do not have impairments." SSR 09-2p. Taken to its logical extreme, Ms. Burner's argument is essentially that every child who requires an insulin pump has an impairment that functionally equals listing 109.00(C). Moreover, Ms. Burner's own argument belies the conclusion that this is a purely objective, medical question. The evidence relied upon by Ms. Burner in support of her contention that she requires 24-hour-a-day adult supervision includes statements by Dr. Holbert that Ms. Burner exhibits poor judgment in regard to her health and statements by Ms. Thompson that Ms. Burner is "immature for her age" and has "poor insight, poor judgment, decreased motivation and hopelessness." Thus, contrary to Ms.

Burner's assertion, the issue of whether she requires 24-hour-a-day adult supervision is not purely a factual medical question. Rather, it is based on whether Ms. Burner's mental condition, combined with her physical condition, renders her subjectively unable to manage her own care without adult supervision.

In making this determination, the ALJ throughly reviewed the medical evidence and noted that while Ms. Burner's blood sugar levels were often erratic, she had suffered no complications from her condition and was usually noted as appearing healthy despite her condition. The ALJ specifically discounted Mrs. Burner's testimony and found her only partially credible. For example, while Mrs. Burner testified that Ms. Burner's condition was "brittle" such that she could not engage in any physical activity, the ALJ noted that Ms. Burner played basketball until her freshman year of high school, recently went to the beach with her father, and goes to the movies and to sleepovers with her friends. Additionally, although Mrs. Burner testified that Ms. Burner needed constant adult supervision, the ALJ noted that Ms. Burner was often left alone with her fourteen year old brother and volunteered to care for her three year old nephew. Based on this evidence, the ALJ found that Ms. Burner's impairments do not cause marked or extreme functional limitations. Accordingly, the ALJ's finding that Ms. Burner's impairment do not cause listing level functional limitations is supported by substantial evidence.

*2. Whether the ALJ Properly Considered the Opinion Evidence?*

Next, Ms. Burner contends that the ALJ improperly rejected Dr. Holbert's medical opinion that Ms. Burner requires 24-hour-a-day adult supervision. In his decision, the ALJ evaluated Dr. Holbert's opinion as follows:

> Turning to the opinion evidence, the undersigned affords little weight
> to the letter of Dr. Holbert dated December 12, 2011. Dr. Holbert

indicated that the claimant requires 24-hour supervision due to her unstable medical condition. He goes on the state that the claimant must be around an adult 24-hours per day who is trained in the proper use of the Glucagon Emergency Kit. However, Dr. Holbert's statements are not supported by the objective medical evidence nor are they supported by the claimant's or her mother's testimony. First, while the medical evidence of record indicates that the claimant's sugar levels are often high, there is no indication that the claimant has sustained any known complications. Second, according to [the mother's] testimony, the claimant is not being monitored by an adult 24-hours per day as she is frequently left with her 14-year-old brother. Moreover, Dr. Holbert indicated that the claimant cannot be relied upon to manage her insulin pump and medications, yet according to the claimant, she volunteers to care for her three-year-old nephew and, at time[s], has cared for him while by herself.

Ms. Burner argues that the ALJ "failed to offer any legitimate or relevant reasoning supporting his rejection of Dr. Holbert's opinion." The Commissioner asserts that Dr. Holbert's opinion is not well supported, and thus, the ALJ properly accorded it little weight.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. § 416.927(b). "Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992). Rather, a treating physician's medical opinion on the issue(s) of the nature and severity of an individual's impairment(s) will be given controlling weight only when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(c)(2); *see also Craig*, 76 F.3d 585, 590 (4th Cir. 2001) (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). Thus, "[b]y

negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. If a treating source's opinion is not entitled to controlling weight, the ALJ must determine the weight to give the opinion based upon an evaluation of the following factors: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist; and (6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c). However, while the ALJ must consider these factors, there is no requirement that the ALJ discuss each of the factors in his decision. All that is required by the regulations is that the ALJ provide an explanation for the weight she assigns to a medical opinion that is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review. [Claimant] cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion.").

Ms. Burner again argues that "much of Dr. Holbert's letter is not opinion, it is medical fact." Thus, she contends that the evidence the ALJ relied on in weighing Dr. Holbert's opinion is "irrelevant to the issue at hand." Ms. Burner argues that the listing does not require that she show complications nor does it require that she show that she is actually in the presence of an adult twenty-four hours a day. Thus, she contends that because the ALJ relied on this evidence in

affording Dr. Holbert's opinion little weight, the ALJ erred. Once again, the undersigned finds Ms. Burner's argument unavailing. The question before the ALJ was whether Ms. Burner's impairments cause marked or extreme functional limitations. The ALJ was required to make this determination by evaluating the record evidence, including medical opinions, in accordance with the regulations.

Here, the ALJ clearly explained the weight he gave to Dr. Holbert's opinion and the reasons for that weight. The ALJ gave specific examples of record evidence that contradicted Dr. Holbert's statements. Dr. Holbert opined that Ms. Burner's medical condition was so complicated and fragile that she must be around an adult 24-hours-a-day. Clearly, evidence in the record showing that Ms. Burner's condition causes no actual complications is relevant to the evaluation of Dr. Holbert's opinion. Likewise, Dr. Holbert opined that Ms. Burner's despondency and poor judgment renders her unable to care for herself without adult supervision. Clearly, evidence in the record that Ms. Burner is often left alone with her younger brother is relevant to determining whether the opinion is consistent with the record. Thus, contrary to Ms. Burner's assertions, the ALJ properly evaluated the record evidence as whole in analyzing Dr. Holbert's opinion and provided good reasons for affording it little weight. He thoroughly discussed the other record evidence that he found to be inconsistent with Dr. Holbert's opinion. Nothing more was required.

*3. Whether Newly Submitted Evidence Requires Remand?*

Ms. Burner's final argument is that because the Appeals Council considered Ms. Thompson's letter and made it part of the record, it is new and material evidence. However, because the Appeals Council did not explain its evaluation of the letter, review by the Court is not possible because it would require this Court weigh the evidence. The Commissioner argues that the letter is not material because there is no reasonable possibility it would have change the ALJ's decision had

it been before him. The Commissioner bases this assertion on the fact that Ms. Thompson is not an acceptable medical source and because her opinion is not supported by the record evidence.

As an initial matter, the Commissioner's argument that Ms. Thompson's opinion is not entitled to consideration because she is not an acceptable medical source lacks merit. As Ms. Burner correctly points out, all opinions regarding an individuals functional limitations are to be considered regardless of whether they are from an "acceptable medical source." *See* SSR 06-03P (S.S.A Aug. 9, 2006) ("Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."). Ms. Thompson's letter was offered to provide insight into the severity of Ms. Burner's opinions. Accordingly, consideration of the letter is wholly appropriate. However, for the reasons discussed more fully below, this additional evidence does not require remand because even considering Ms. Thompson's letter, substantial evidence support the ALJ's decision.

A claimant who is "dissatisfied with the hearing decision...may request that the Appeals Council review that action." 20 C.F.R. § 416.1467. "The Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an administrative law judge." *Id*. The regulations also permit a claimant to submit additional evidence when requesting review by the Appeals Council. § 416.1470(b). When such additional evidence is submitted, the Appeals Council must determine if the evidence is "new and material" and whether it "relates to the period on or before the date of the administrative law judge hearing decision." *Id*.

Evidence is new "if it is not duplicative or cumulative" and is material if there is "a reasonable possibility that the new evidence would have changed the outcome." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991). Once the Appeals Council decides the evidence is new and material, it will then evaluate the entire record including the new and material evidence. 20 C.F.R. § 416.1470(b); *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). After this evaluation of all of the evidence, including the newly submitted evidence, the Appeals Council will grant the request for review if it finds that the ALJ's decision is "contrary to the weight of the evidence currently of record." *Meyer*, 662 F.3d at 705. However, "[i]f upon consideration of all of the evidence, including any new and material evidence, the Appeals Council finds the ALJ's action, findings, or conclusions not contrary to the weight of the evidence, the Appeals Council can simply deny the request for review." *Id*.

Here, Ms. Burner submitted additional evidence to the Appeals Council. In its Notice of Appeals Council Action, the Appeals Council specifically noted that it considered the additional evidence, including Ms. Thompson's letter. The Appeals Council stated that it "considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of evidence of record. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." Thus, the Appeals Council necessarily considered Ms. Thompson's letter new and material because it considered the letter and made it part of the record. *See Meyer*, 662 F.3d at 705-06. However, its conclusion that "this information does not provide a basis for changing the [ALJ's] decision" amounts to a finding that the new evidence did not alter the weight of the record such that a review of the ALJ's decision was necessary. Ms. Burner argues that the Appeals

Council's lack of articulated findings makes review by this Court impossible because Ms. Thompson's letter "directly contradicts the ALJ's finding regarding the Listing."

In general, the Appeals Council is not required to articulate any findings when it denies review after considering new evidence, and "the lack of such additional fact finding does not render judicial review impossible–as long as the record provides an adequate explanation of [the Commissioner's] decision." *Meyer*, 662 F.3d at 706 (internal quotations omitted). Thus, when the new evidence is so "one-sided" that review is still possible despite a lack of factual findings by the Appeals Council, remand is not required. For example, when a review of the new evidence submitted to the Appeals Council still allows the conclusion that substantial evidence supports the ALJ's decision, the ALJ's denial of benefits should be affirmed. *Smith v. Chater*, 99 F.3d 635, 638-39 (4th Cir. 1996). Similarly, "when consideration of the record as a whole reveal[s] that new evidence from a treating physician was not controverted by other evidence in the record" the reviewing court may reverse the ALJ's decision because the ALJ's denial of benefits is not supported by substantial evidence. *Meyer*, 662 F.3d at 706 (citing *Wilkins*, 953 F.2d at 96). However, where the new evidence creates a conflict with the existing evidence such that the new evidence must be weighed, remand is required so that the Commissioner can assess the evidence and resolve the conflict because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder." *Id.* at 707.

Here, Ms. Burner likens her case to a case before United States District Judge Stamp, *McCartney v. Astrue*, 5:07-cv-103, 2008 WL 4371666 (N.D.W.Va. 2008), in which Judge Stamp remanded the case back to the Commissioner because "additional evidence incorporated by the Appeals Council potentially contradicts the ALJ's conclusion that the plaintiff's mental impairment

is not severe." Ms. Burner contends that Ms. Thompson's letter directly contradicts the ALJ's findings, so remand is appropriate. The undersigned does not agree.

In *McCartney*, the ALJ found that the plaintiff suffered from no severe mental impairments. The plaintiff submitted additional medical evidence from two psychologists, both of whom diagnosed the plaintiff with severe, recurrent major depressive disorder. Because this evidence created a conflict, Judge Stamp remanded the case in order to allow the Commissioner to weigh and evaluate the new evidence. *McCartney* is not controlling here for several reasons. First, the case was decided before the Fourth Circuit's decision in *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011), which clearly articulated the framework a reviewing Court must follow when faced with this situation. In fact, Judge Stamp acknowledged the lack of guidance from the Fourth Circuit on this issue in footnote 4 of his opinion, where he noted that "The United States Court of Appeals for the Fourth Circuit appears to have no published decision addressing the issue of whether the Appeals Council must explain its treatment of additional evidence, and although two unpublished opinions do address this issue, they are in conflict." Second, unlike the new evidence presented in *McCartney*, which both corroborated evidence the ALJ rejected and contradicted evidence upon which the ALJ relied, Ms. Thompson's letter does not contradict any other record evidence. It merely restates Dr. Holbert's opinion.

Similarly, in *Meyer*, the ALJ determined that the plaintiff could perform light work, in part, because the record evidence lacked any "restrictions placed on the claimant by a treating physician." The new evidence presented to the Appeals Council consisted of an opinion by a treating physician outlining certain restrictions. Thus, the new evidence filled an "evidentiary gap" that the ALJ specifically found was lacking and was critical to the ALJ's decision. Additionally, the new

evidence corroborated an opinion the ALJ had rejected *and* conflicted with evidence the ALJ had credited. Here, in contrast, Ms. Thompson's letter did not present any additional evidence that fills an evidentiary gap, nor does other record evidence credited by the ALJ conflict with Ms. Thompson's letter. Therefore, Ms. Thompson's letter does not *create* a conflict such that it must be weighed by a fact finder. For example, the ALJ here rejected Dr. Holbert's opinion, in part, because medical records revealed no known complications from Ms. Burner's condition. Had Ms. Burner submitted new evidence showing that these complications existed, this additional evidence would have created a conflict with the existing evidence such that the only way to be certain that the ALJ's decision was still based on substantial evidence would be to weigh Ms. Thompson's letter. However, because Ms. Thompson's letter merely restates, almost verbatim, the opinion of Dr. Holbert, which the ALJ properly afforded little weight, no such conflict is created here.

Applying these principles, and considering the record as a whole, the undersigned finds that Ms. Thompson's letter does not create a conflict such that remand is appropriate. Accordingly, the ALJ's decision is supported by substantial evidence.

## IV. RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.      Ms. Burner's Motion for Summary Judgment be **DENIED**.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which

objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: February 21, 2014          /s/ *James E. Seibert*
                                              JAMES E. SEIBERT
                                              UNITED STATES MAGISTRATE JUDGE